COURT OF APPEALS
DECISION
DATED AND FILED

March 8, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1451**

Cir. Ct. No. **2020GN38**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

IN THE MATTER OF THE GUARDIANSHIP AND PROTECTIVE PLACEMENT OF **R. V.**:

OUTAGAMIE COUNTY,

PETITIONER-RESPONDENT,

V.

**R. V.**,

RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Outagamie County: MARK J. MCGINNIS, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. "Richard"[1] appeals from orders for guardianship and protective placement under WIS. STAT. chs. 54 and 55, respectively. Richard argues that Outagamie County failed to present sufficient evidence to support the orders. We disagree and therefore affirm.

## BACKGROUND

¶2    On March 9, 2020, Richard, then fifty-nine years old, suffered a stroke and was hospitalized for two days before returning home. On March 25, Richard was again hospitalized after he called 911 for the eleventh time to complain of blood pressure issues. One day later, the County petitioned for temporary and permanent guardianship and for protective placement. According to the petitions, Richard met the standards for guardianship and protective placement because the stroke had impaired his "ability to make safe and rational decisions about his safety"; he had "become notably more impulsive, verbally aggressive, demanding, and irrational in his thinking/behaviors"; and he required physical assistance that his wife, "Theresa," could no longer safely provide in their home. Following a probable cause hearing, the court commissioner ordered temporary guardianship of Richard's person and estate, with Theresa appointed as guardian, and temporary protective placement in the hospital, with transfer to a skilled nursing facility or similar facility upon discharge.

¶3    On April 20 and 21, 2020, the circuit court held a final hearing on the petitions. The court heard testimony from Dr. Michele Andrade, the

---

[1] In keeping with the policy expressed in WIS. STAT. RULE 809.86 (2019-20), we refer to the appellant and his wife by pseudonyms to protect their privacy. All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

court-appointed examining psychiatrist; Dr. Andrew Beine, Richard's primary care provider; Tanya Vickery, the County clinical therapist who investigated the protective placement referral; and Theresa. As we discuss in more detail below, these witnesses testified—consistent with their knowledge and experience—that Richard's stroke had left him cognitively impaired and highly irritable and aggressive. The witnesses also testified about Richard's extensive and pre-existing physical disabilities and medical issues, including his bipolar disorder. According to the testimony, Richard could not evaluate information so as to make informed financial or health care decisions, and he could not adequately assess his own health care needs or cooperate in his own care.

¶4    These witnesses further testified to the need for protective placement—specifically, that Richard's disabilities were likely to be permanent, that he had a primary need for residential care, and that he could not safely provide for his own care or custody. In addition, R.V.'s guardian ad litem filed a report and provided an oral recommendation to the court in favor of guardianship and protective placement.

¶5    Richard also testified and provided his own explanations of the events described by the County's witnesses. Richard testified that his aggressive or inappropriate behavior stemmed from isolated incidents that he would not repeat. He also testified that he was not so physically limited that he was unable to provide for his own care. During questioning from his attorney, Richard correctly answered questions testing his mental ability.

¶6    The circuit court determined that Richard met the criteria for guardianship of his person and estate and for protective placement, and it entered those corresponding orders. The guardianship order retains Theresa as guardian of

Richard's person and estate. The protective placement order designates an unlocked unit as the least restrictive placement, and it continues Richard's placement in the hospital "with the expectation of transition to a skilled nursing facility or like facility as soon as a facility can be secured for him and the transfer arranged." Both orders require Richard to be re-evaluated within forty-five days of the date the orders were issued to assess his recovery from the stroke. Richard appeals. We discuss further facts below where pertinent to our analysis.

## DISCUSSION

### I. *Standards of Review*

¶7 Richard argues that the County has not established the elements of guardianship and protective placement by clear and convincing evidence. *See* WIS. STAT. §§ 54.10(3)(a), 55.10(4)(d). On review, we uphold the circuit court's findings of fact unless they are clearly erroneous, but we determine de novo whether the evidence meets the legal criteria for guardianship and protective placement. *Walworth Cnty. v. Therese B.*, 2003 WI App 223, ¶21, 267 Wis. 2d 310, 671 N.W.2d 377.

### II. *Guardianship*

¶8 WISCONSIN STAT. § 54.10(3)(a) sets forth the circumstances under which a circuit court may appoint a guardian of the person and of the estate on the basis of incompetency.[2] There are three requirements pertinent to this appeal.

---

[2] Where a person has "been adjudicated by a court as meeting the requirements of [WIS. STAT. §] 54.10(3)," that person is deemed "incompetent." WIS. STAT. § 54.01(16).

4

First, to obtain guardianship of the person, the petitioner must prove that "because of an impairment, the individual is unable effectively to receive and evaluate information or to make or communicate decisions to such an extent that the individual is unable to meet the essential requirements for his or her physical health and safety." Sec. 54.10(3)(a)2. "Impairment," as used in § 54.10(3)(a)2., is defined, in pertinent part, as a "serious and persistent mental illness, degenerative brain disorder, or other like incapacit[y]." WIS. STAT. § 54.01(14). The phrase "[m]eet the essential requirements for physical health or safety" means to "perform those actions necessary to provide the health care, food, shelter, clothes, personal hygiene, and other care without which serious physical injury or illness will likely occur." Sec. 54.01(19).

¶9 Second, to obtain guardianship of the estate, the petitioner must prove that, "because of an impairment, the individual is unable effectively to receive and evaluate information or to make or communicate decisions related to management of his or her property or financial affairs," to the extent that any of the following applies: "a. The individual has property that will be dissipated in whole or in part[;] b. The individual is unable to provide for his or her support[; or] c. The individual is unable to prevent financial exploitation." WIS. STAT. § 54.10(3)(a)3.

¶10 Finally, the petitioner must show that "[t]he individual's need for assistance in decision making or communication is unable to be met effectively and less restrictively through appropriate and reasonably available training, education, support services, health care, assistive devices, a supported decision-making agreement under [WIS. STAT.] ch. 52, or other means that the individual will accept." WIS. STAT. § 54.10(3)(a)4. As set forth below, the County met its burden of establishing these requirements.

¶11 With respect to "impairment," Dr. Andrade testified that, as a result of his stroke, Richard has a neurocognitive disorder, which she described as a degenerative brain disorder. She also testified that the stroke exacerbated Richard's preexisting bipolar disorder, which she described as a major mental illness. Thus, the evidence supports the court's determination that Richard has an impairment, and Richard does not dispute this determination on appeal. Richard contends, however, that the County failed to show that his impairment rendered him unable to protect his physical health or his finances as required by WIS. STAT. § 54.10(3)(a)2. and 3. He also argues that the County failed to show that less restrictive means were not available. *See* § 54.10(3)(a)4. We address these arguments in turn.

A. Inability to meet essential physical or financial needs

¶12 In its oral ruling, the circuit court determined that there was clear and convincing evidence demonstrating that Richard "lack[ed] the ability to make … decisions and to communicate in a way that would allow others to take care of him," making him a danger to himself. Along similar lines, the court determined that there was clear and convincing evidence that Richard was unable to effectively "receive and evaluate information" or "effectively make or communicate decisions relating to the management of his … property or financial affairs." The guardianship order reflects the court's conclusion that Richard met the statutory criteria (set forth above) for guardianship of the person and the estate.

¶13 The following testimony supports the circuit court's conclusions. Doctor Andrade testified that Richard's stroke had exacerbated his mental illness and that Richard had both cognitive and behavioral symptoms. For example, Richard gave "nonsensical" responses to questions, performed poorly on memory

6

tests, and did not remember the name of his employer before retirement. Richard was also irritable, aggressive, and overly emotional.

¶14 Doctor Andrade testified that, although Richard could "communicate decisions," his impairment interfered with his ability "to understand and apply those decisions," meaning that he could not ultimately "meet the essential requirements for his physical health and safety" or "manage his property and financial affairs" to avoid dissipation of property. Andrade noted, for example, that during her examination Richard called the nurse "because he felt he had a pain," but then he "forg[o]t immediately his reason for calling." Andrade further explained that Richard "exhibited excessive spending habits" post-stroke: "[h]e has purchased seven mobility scooters recently and he only needs one," and "[h]e has r[u]n up his credit card debt to where they needed to procure a loan to pay that off." She testified that, without a guardianship, Richard was at risk to have his property dissipated and would be unable to provide for his own support.

¶15 Doctor Beine testified that Richard was re-hospitalized two weeks after his stroke because of post-stroke behavioral changes. Beine explained that, in the couple of days before the hearing, Richard had not wanted to talk to him. Based on prior discussions, however, Beine opined that Richard "has not had adequate insight or demonstrate[d] the appropriate reasoning in regards to his health to be able to make decisions."

¶16 Doctor Beine discussed Richard's cognitive and behavioral problems in the hospital. For example, Beine testified that Richard did not understand why he had been re-hospitalized and that Richard had repeatedly tried to call 911 so that an ambulance could take him away from the hospital. Beine testified, "There's been times where the police have to come in to talk to [Richard] about

appropriate use of his phone in calling 911 from the hospital." Richard also "has thrown himself out of bed." Beine further testified that, post-stroke, Richard did not act appropriately toward hospital staff. For example, on one occasion, Richard was "very aggressive" and "yelling" at staff; on another occasion, he threw a full can of soda at a nurse. Richard also "made multiple inappropriate" sexual or "bizarre" comments to the nursing staff and "tr[ied] to get nurses' addresses."

¶17 Vickery, a County clinical therapist, testified about the protective placement study she completed on behalf of the County, as required for the protective placement order. *See* WIS. STAT. § 55.11. She testified that Richard displayed post-stroke "behavioral challenges," such as aggression and agitation. For example, Richard called Vickery names during telephone conversations, and he called both her and his wife names during Vickery's in-person visit. Vickery opined that, based on his behavior, Richard did not have the current ability to make his own health care and financial decisions. For example, Richard refused to cooperate with the hospital nurses in "simple tasks," like changing his ileostomy bag; he "has been refusing OT [occupational therapy] and PT [physical therapy] services"; he "pushes his call light incessantly"; and he "inappropriately" called the police on "multiple occasions."

¶18 Vickery also testified that Richard had "minimal insight into his impairments" and "a significant lapse in his judgment and reasoning abilities." As discussed further below, Vickery also described Richard as needing significant assistance with his activities of daily living. Vickery noted that Richard "will verbalize that he can do things on his own," but "that isn't the case when you ask anyone who is providing care[] for him, be it his wife or hospital staff or even when I met with him and was able to observe him." Vickery testified that Richard

was on one-to-one supervision at the hospital because he would "start screaming and yelling" anytime he was left alone in his room.

¶19     Richard's wife Theresa testified that in the two weeks after his stroke and before he was re-hospitalized, Richard called 911 eleven times because he believed his blood pressure was too high.  Theresa explained that Richard called 911 because he wanted attention, even though he knew that he was not experiencing an emergency.  She also testified that the paramedics called her a few times, informing her, "We can't be coming over every time he calls 911 especially with this Coronavirus going on."  In addition, Theresa testified that she "was more or less doing everything for" Richard, who was not physically able to get out of his chair, walk, use the toilet, or prepare his own food.  According to Theresa, since his stroke, Richard would "blow up" very easily, he would tell her to "shut up," and they "couldn't even have a conversation without him screaming and yelling at [her]."

¶20     Richard testified and correctly answered questions testing his mental ability (for example, he knew who the president of the United States was, and he correctly counted backward by fours).  Richard acknowledged that the stroke had made him more emotional and had "negatively impacted" him.  He maintained, however, that he still had the ability to make his own health care and financial decisions.  Richard's testimony about his physical limitations was contrary to the other testimony, in that he described himself as mobile and able to complete activities of daily living without Theresa's help.  Notably, Richard offered no expert testimony to rebut the County's experts, despite having obtained an independent examination.

¶21 We conclude that this evidence is sufficient to support the circuit court's determination that Richard's impairment (i.e., his post-stroke degenerative brain disorder coupled with his mental illness) had left him unable to receive and evaluate information or make or communicate decisions, such that he could not effectively protect his own health, safety, finances or property. In arguing otherwise, Richard attacks the physician witnesses' qualifications, experience and expertise. For example, he argues that the physician witnesses did not administer the correct tests to assess cognitive function, that they evaluated him too soon after the stroke, and that they ignored the possibility that his symptoms might improve. But it was within the court's purview to assess the evidence and judge witness credibility. *See Mullen v. Braatz*, 179 Wis. 2d 749, 756, 508 N.W.2d 446 (Ct. App. 1993) (it is the trial court's function to assess the weight and credibility of testimony). We will not second-guess the court's determination that these witnesses adequately and appropriately evaluated Richard.

¶22 Richard also argues that "any claim that [he] lacked insight into his illness and need for treatment is belied by his own testimony," in which he acknowledged that he needed therapy and help with activities of daily living. This argument ignores the fact that Richard's testimony on these points contradicted that of other witnesses. For example, Richard represented that he could perform a variety of activities of daily living, whereas Vickery and Theresa testified that, while at home, he relied on Theresa to perform these functions. Thus, the circuit court could have reasonably credited Vickery's and Theresa's testimony over Richard's and found that Richard had limited insight about his mental and physical needs. In any case, the fact that Richard acknowledged his physical needs and limitations at the hearing does not negate the court's conclusion that Richard

ultimately lacked the mental capacity to evaluate health care or financial information or act in his own best interest in these matters.

¶23     Richard further argues that, even accepting the physician witnesses' testimony, that testimony does not demonstrate that his impairment made him incapable of making health care and financial decisions.  Richard argues that he may display "poor judgment" and have a "physical disability" but that these are not grounds for guardianship.  *See* WIS. STAT. § 54.10(3)(b) ("Unless the proposed ward is unable to communicate decisions effectively in any way, the determination [of incompetency] may not be based on mere old age, eccentricity, poor judgment, physical disability, or the existence of a supported decision-making agreement.").

¶24     This argument ignores physician testimony that Richard's stroke exacerbated his bipolar disorder and significantly impaired his cognitive functioning.  The County showed that Richard's impairments directly impacted his ability to receive and evaluate information, and the record reflects that the circuit court did not order guardianship solely because Richard had a physical disability. The court remarked that Richard needed assistance with physical tasks, but in determining whether he met the criteria for guardianship, the court focused on Richard's decision-making abilities.  Moreover, although the court did not find so explicitly, Richard's physical disability is *relevant* to the capacity determination, insofar as he could not or would not acknowledge that he needed significant assistance with activities of daily living.  We conclude that the County met its burden on these elements of guardianship.

B.  Need for assistance in decision-making or communication cannot be met effectively through less restrictive means that the individual will accept

¶25     As stated, to obtain a guardianship order, the County was required to show that Richard's "need for assistance in decision[-]making or communication [wa]s unable to be met effectively and less restrictively through appropriate and reasonably available training, education, support services, health care, assistive devices, a supported decision-making agreement or … other means that [Richard] would accept." *See* WIS. STAT. § 54.10(3)(a)4.

¶26     The circuit court found that Richard had significant behavioral issues that made it difficult for his wife and hospital staff to work with him. The evidence, as summarized above, supports this finding. Moreover, Richard's testimony indicated that he did not understand or appreciate how his conduct affected others. For example, whereas Vickery and Theresa testified that Richard was often angry, abusive and uncooperative, Richard denied these behaviors, framed them as isolated incidents, or—as with repeatedly calling 911 or throwing a can of soda at a nurse—suggested that they were justified. Thus, the court reasonably concluded that Richard would not accept help or allow others to assist in his decision-making.

¶27     In addition, Dr. Andrade's report, which was entered into evidence, states that guardianship is the least restrictive option because "[d]ue to untreated mental illness [and] severe physical illnesses [Richard] requires prolonged therapies to see if improvement is possible." A reasonable inference is that, given Richard's current level of impairment, "available training" and "education" would be insufficient to enable him to receive and evaluate health care and financial

information. *See* WIS. STAT. § 54.10(3)(a)4. We conclude that sufficient evidence supports this element of guardianship.

*III. Protective Placement*

¶28 The circuit court may protectively place an adult who has been determined incompetent under WIS. STAT. § 54.10(3)(a). WIS. STAT. § 55.08(1)(b); *see also* WIS JI—CIVIL 7060 (2019). To do so, the court must make several findings by clear and convincing evidence relating to the individual's needs, capabilities and disability. *See* WIS. STAT. §§ 55.08(1), 55.10(4)(d). In addition, protective placement must be to "the least restrictive environment and in the least restrictive manner consistent with the needs of the individual to be protected and with the resources of the county department." WIS. STAT. § 55.12(3). We examine these standards below.

A. <u>Primary need for residential care and custody</u>

¶29 Protective placement requires that the individual have "a primary need for residential care and custody." WIS. STAT. § 55.08(1)(a). "Primary need for residential care and custody" means the individual "must have a primary need (1) to have his or her daily needs provided for in a residential setting; and (2) to have someone else exercising control and supervision in that residential setting for the purpose of protecting the person from abuse, financial exploitation, neglect, and self-neglect." ***Jackson Cnty. DHHS v. Susan H.***, 2010 WI App 82, ¶16, 326 Wis. 2d 246, 785 N.W.2d 677.

¶30 The circuit court concluded that Richard had a primary need for residential care and custody because he did not have the physical or mental capability to care for himself and because Theresa was no longer able or willing to

13

care for him in their home. The evidence supports this conclusion. Aside from Richard, all of the witnesses testified that Richard needed significant assistance with daily tasks (among other physical limitations, Richard could not ambulate, was a fall risk, was incontinent, had diabetes, and had gangrene on a finger). Moreover, there was testimony that Theresa was both unable and unwilling to continue caring for Richard in their home, that Richard had made unwise and unnecessary purchases, and that Richard was not acting in his best interest with respect to his health and health care. We conclude that this is clear and convincing evidence supporting the court's determination that Richard had a primary need for residential care and custody.

¶31     On appeal, Richard suggests that a "primary need for residential care and custody" means that an individual needs "constant" or "around-the-clock" care. But this is not the legal standard under *Susan H.*, which simply asks whether the individual's "daily needs" (whatever they may be) need to be "provided for within a residential setting." *Id.* Richard also disputes the conclusion that he cannot provide for his own daily needs, but this was a question for the fact-finder to decide, after weighing all the evidence. The circuit court found that Richard needed "intense assistance" to satisfy his daily needs; this finding is not clearly erroneous.

B.  Substantial risk of serious harm

¶32     As pertinent here, the second criteria for protective placement is that, because of a "degenerative brain disorder" or a "serious and persistent mental illness," the individual must be "so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others." WIS. STAT. § 55.08(1)(c). The circuit court did not discuss this

element in the context of protective placement, but its order reflects that the County satisfied this standard. Moreover, as stated, in discussing guardianship, the court determined that Richard could not provide for his own care and that he posed a danger to himself without a court order.

¶33    The evidence supports this finding. Specifically, as discussed, the evidence was that Richard's degenerative brain disorder (caused by his stroke) and his serious and persistent mental illness (bipolar disorder exacerbated by the stroke) had left him incapable of directing, or cooperating in, his own care, and that he would face a substantial risk of serious harm if he managed his own care. On appeal, Richard does not engage with this standard or set forth any detailed argument as to why serious harm would not result without residential care. We conclude that there was sufficient evidence supporting the circuit court's determination that residential care was necessary to avert the risk of serious harm.

### C. Disability is permanent or likely to be permanent

¶34    Third, for an individual to be protectively placed, his or her disability must be "permanent or likely to be permanent." WIS. STAT. § 55.08(1)(d). Contrary to Richard's arguments, the record supports the circuit court's determination that this standard was met.

¶35    Richard argues that his disability is neither permanent nor likely to be permanent because he has improved since his stroke and may continue to improve. Specifically, he critiques Dr. Andrade's testimony on this point, arguing that her testimony is internally inconsistent and that she was not qualified to conclude that his disability is permanent or likely to be permanent.

¶36     We disagree that Dr. Andrade's testimony is inconsistent. She testified both that Richard's disabilities and symptoms were likely to be permanent and that his symptoms might possibly improve—two statements that are not contradictory. Moreover, as previously noted, it was the circuit court's role to weigh the evidence and make credibility determinations.

¶37     Richard further implies that protective placement is inappropriate or legally impermissible in those situations where an individual is recovering or improving. However, a circuit court must base its protective placement determination on the evidence as it exists at the time of the hearing, not on what might occur in the future. Moreover, Richard provides no authority for the assumption that *any* degree of recovery renders the disability impermanent; nor would such an assumption seem logical where the ultimate question is whether the *disability* (not any specific symptom) is permanent. Accordingly, we do not address this argument in depth. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (we may choose not to address issues that are inadequately briefed or unsupported by legal authority).

¶38     We do note that Richard may petition to terminate the order if he sufficiently recovers from his stroke and that the County must annually review his protective placement. *See* WIS. STAT. §§ 55.17, 55.18. In addition, in this case, the circuit court ordered a review of the protective placement within forty-five days, thereby accounting for the possibility that Richard might improve. Ultimately, however, the court was in the best position to assess how the possibility of future improvement impacted its determination that the disability was likely to be permanent.

D. Least restrictive placement

¶39 Finally, protective placement "shall be provided in the least restrictive environment and in the least restrictive manner consistent with the needs of the individual to be protected and with the resources of the county department." *See* WIS. STAT. § 55.12(3). The physician witnesses and Vickery testified that, consistent with their assessments of Richard's mental and physical needs, the least restrictive placement was to a skilled nursing facility. Thus, the evidence supports the circuit court's determination that the least restrictive placement was to inpatient care (a nursing home).

¶40 Richard argues that the County "failed to prove that an in-patient facility was the least restrictive option for" him because "the Department had determined that [he] was eligible to receive *some* in-home care." At the hearing, the parties and the circuit court explored how care might be provided in the home. There was no evidence presented, however, that the level of in-home care Richard needed was in fact available and affordable, with or without County resources. Thus, the court did not err in determining that Richard's needs should be met in an inpatient setting.

¶41 For the reasons stated, we affirm the orders for guardianship and protective placement.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.